UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:14-CV-104-GNS-HBB

CARL WATSON RICCHUITE                                                          PLAINTIFF

v.

JOEY JOHNSON, et al.                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Motions for Summary Judgment (DN 67, 71, 72), and Defendants' Motions to Supplement (DN 87, 88, 89).  This matter is ripe for adjudication.  For the following reasons, Defendant's Motions for Summary Judgment are **GRANTED**, and the remaining motions are **DENIED AS MOOT**.

## I.      BACKGROUND

In February 2012, a 1,000 gallon anhydrous ammonia tank was stolen from Crop Production Services in Todd County, Kentucky.  (Def.'s Mot. Summ. J. Ex. A, at 1-2, DN 72-2 [hereinafter KYIBRS Report I]); Def. Mot. Summ. J. Ex. B, at 4, DN 72-3 [hereinafter KYIBRS Report II]).  The Todd County Sheriff's Department initially investigated the theft, but did not identify a suspect.  (KYIBRS Report II, at 4; Johnson Dep. 29:19-20, Feb. 1, 2016, DN 68).  On July 26, 2013, a Kentucky State Police ("KSP") trooper arrested John David Williams on traffic and drug charges.  (KYIBRS Report II, at 4).  Williams told the arresting officer that he had useful information concerning the location of the stolen anhydrous tank.  (KYIBRS Report II, at 4).  Believing that the tank was in Christian County, KSP contacted Christian County Sheriff's Office Detective Jimmy Berghammer ("Berghammer").  (KYIBRS Report II, at 4).  Discovering

that the tank was actually located in Todd County, Kentucky, Berghammer investigated the property with Todd County Sheriff Joey Johnson ("Johnson").  (Johnson Dep. 31:18-23).

On August 2, 2012, Berghammer and Johnson discovered the tank on property owned by Carl Watson Ricchuite (hereinafter "Ricchuite") and his brother.  (KYIBRS Report I, at 1-2; Johnson Dep. 34:6-9).  The stolen anhydrous tank was buried in the ground up to the valve guard and covered with camouflage netting.  (Johnson Dep. 34:6-9).  Also found at the site were items associated with manufacturing methamphetamine, including punctured starter fluid cans, coffee filters, modified propane/anhydrous tanks, and evidence of an exploded shed. (KYIBRS Report I, at 2).  Berghammer and Johnson returned to the property on numerous occasions in an attempt to identify who had been using the tank to manufacture methamphetamine and eventually attached a motion-activated camera to a tree near the tank; however, no suspects were identified. (Johnson Dep. 35:15-17; 36:7-13; Berghammer Dep. 41:4-18, Feb. 2, 2016, DN 73).

In December 2012, Johnson obtained information indicating that Ricchuite and Chris Mallory intended to remove the tank after learning that law enforcement was conducting surveillance in the area. (Johnson Dep. 45:24-25, 46:1).  On or about December 7, 2012, Ricchuite and his brother authorized the Todd County Sheriff's Department to search the farm, and the anhydrous tank was excavated later that day.  (Ricchuite Dep. 71:1-8, Jan. 12, 2015, DN 69; Johnson Dep. 49:20-22).  After the excavation, Johnson turned the investigation over to Todd County Deputy Sheriff Tracy White ("White").  Johnson believed White would be more skilled in a drug investigation because White had been a member of the Pennyrile Narcotics Task Force for several years.  (Johnson Dep. 64:2-13).  Thereafter, Johnson's only actions pertaining to the investigation consisted of meeting with Michael Darden ("Darden") and asking him to talk to White, allowing Berghammer to use Johnson's office to conduct an interview with Paula Gilkey

2

regarding the tank, and asking a potential witness, Tommy Hudnall ("Hudnall"), to speak with White.  (Johnson Dep. 75:7-16, 77:2-18, 91:9-15).  Johnson testified that he had no involvement in the decision to charge Ricchuite.  (Johnson Dep. 67:16-19).

Ricchuite claims that during the investigation Johnson was constantly telling others that Ricchuite had been manufacturing meth.  According to Ricchuite, Johnson told Nick Christian ("Christian") that Ricchuite was guilty and had bought off the Todd County Attorney, Harold "Mac" Johns, and a judge.  (Ricchuite Dep. 75:12-21).  Allen Potter ("Potter") and Smith Chastine ("Chastine") allegedly overheard Johnson at a restaurant say that Ricchuite was the biggest drug dealer in the county, was a kingpin of organized crime, and had one million dollars buried in his backyard.  (Ricchuite Dep. 78:7-25-79:1-3).  Johnson supposedly told Bruce Laster ("Laster") that Ricchuite was the biggest drug dealer in western Kentucky and sold drugs to school children.  (Ricchuite Dep. 85:15-86:8).  Johnson also allegedly told White that Ricchuite had bought off a juror.  (Ricchuite Dep. 80:17-82:2).  Further, according to Ricchuite, Johnson told a police officer, Brian Atkinson ("Atkinson"), that even if he did not have enough evidence against Ricchuite, he would make Ricchuite pay for a lawyer.  (Ricchuite Dep. 92:5-17).  Ricchuite has no firsthand knowledge of these statements imputed to Johnson, however, and no other witness has been produced who heard any of the alleged utterances.

Ricchuite claims that both before and after the tank was removed from his property, Johnson followed him almost every night for several months until just before the beginning of Ricchuite's trial in July 2013. (Ricchuite Dep. 115:1-10).  Ricchuite testified that Johnson parked across from Ricchuite's house and videotaped him on at least one occasion.  (Ricchuite Dep. 120:17-25).  Ricchuite said that Johnson never came on his property while engaging in these activities and testified that the "stalking" activity by Johnson ended before Ricchuite's trial on

July 29, 2013.  (Ricchuite Dep. 126:1-10).  Ricchuite alleges that Johnson would follow him daily, while Johnson claims he never followed Ricchuite on purpose and only remembers being behind him one or two times.  (Johnson Dep. 3:21-84:9).

On April 19, 2013, a Todd County Grand Jury indicted Ricchuite on two charges: (1) Receiving Stolen Property, Anhydrous Ammonia with Intent to Manufacture Methamphetamine; and (2) Complicity to Manufacture Methamphetamine, 1st Offense.  (Def.'s Mot. Summ. J. Ex. D, at 1-3, DN 72-5 [hereinafter Indictment No. 13-CR-00014]).  Johnson and Berghammer had no involvement with the grand jury proceedings, and neither testified to the grand jury. (Berghammer Dep. 70:15-17; Johnson Dep. 82:2-10).  In fact, Berghammer was not even aware an indictment had been returned in the case until he received a subpoena to testify at trial. (Berghammer Dep. 70:18-22).  Berghammer's only contact with the county attorney who presented the case to the grand jury was to turn over his investigative reports.  (Berghammer Dep. 69:16-26, 70:15-17).  Ricchuite was arrested on April 20, 2013, and Ricchuite was ultimately acquitted of both charges on July 29, 2013.  (Def.'s Mot. Summ. J. Ex. E, at 1, DN 72-6 [hereinafter Uniform Citation]; Def.'s Mot. Summ. J. Ex. F, at 1, DN 72-7 [hereinafter Docket Sheet]).

KSP Senior Trooper Curtis Crick ("Crick") began covering Todd County as part of his territory for the KSP on February 1, 2014, roughly six months after Ricchuite's meth trial concluded.  (Crick Dep. 11:4-5, Feb. 4, 2016, DN 70).  At 10:47 p.m. on May 6, 2014, Crick noticed a pickup truck leaving from a driveway in an area known for drug related activity. (Crick Dep. 28:9-17; Def.'s Mot. Summ. J. Ex. 2, at ¶ 4, DN 71-7 [hereinafter Crick Aff.]).  He neither recognized the vehicle nor its driver, Ricchuite.  (Crick Aff. ¶ 5).  Moreover, the truck was not Ricchuite's normal vehicle, and Ricchuite testified that he did not drive it very often.

(Def.'s Mot. Summ. J. Ex. 3, at 138, DN 71-8 [hereinafter Tr. of Criminal DUI Trial, July 21, 2014]).  Crick followed the vehicle until the driver failed to give a proper turn signal and then pulled the vehicle over.[1]  (Crick Aff. ¶ 6).

During the traffic stop, Crick noticed that Ricchuite was jittery, rubbed his fingers together, and smacked his gums.  (KYIBRS Report III, at 3).  While Crick acknowledged that most motorists he stops appear nervous, Ricchuite's actions exceeded the norm, prompting Crick to investigate further.  (Crick Aff. ¶¶ 7-8).  Crick told Ricchuite that he suspected he was under the influence of drugs and was going to give him a few tests.  (KYIBRS Report III at 3). Ricchuite exhibited several behaviors suggestive of amphetamine or drug use, as noted by Crick during the stop:  Ricchuite was highly nervous and jittery; he was smacking his gums, grinding his teeth, and frantically rubbing his hands together; he was sweating profusely, complaining of "cotton mouth"; and his answers to Crick's questions were incoherent.  (Crick Aff. ¶9).  Crick suspected that Ricchuite might be driving under the influence of drugs, so he administered three field sobriety tests.  (Crick Aff. ¶ 9).  Ricchuite failed all three tests.  (Ricchuite Dep. 207:22-25). Ricchuite protested to Crick that the One-Leg-Stand test was impossible and that no one could do it.  (Ricchuite Dep. 214:4-13; Def.'s Mot. Summ. J. Ex. 4, at 4, DN 71-10 [hereinafter Uniform Citation]).  Additionally, Ricchuite claims that the tests were given on a grade to make the tests purposefully more difficult to pass.  (Ricchuite Dep. 207:19-21).  After the failed sobriety tests, Crick arrested Ricchuite on three misdemeanor charges of driving under the influence, failure to produce insurance, and failure to activate a turn signal.  (KYIBRS Report III, at 1).

---

[1] While he could not recall during his DUI trial whether he activated his turn signal 100 feet before the intersection, Ricchuite testified during discovery that he activated his turn signal a distance of 300-400 feet before the intersection.  (Tr. of Criminal DUI Trial 139-40; Ricchuite Dep. 204:18-20).

After the arrest, Ricchuite continued to exhibit signs of being under the influence.  (Crick Aff. ¶11).  Ricchuite cursed at Crick in the cruiser, complained of a dry mouth, repeatedly asked for a drink, and continued to smack his gums and rub his fingers together.  (Crick Aff. ¶11). Crick took Ricchuite to Logan Memorial Hospital where Ricchuite refused to submit to a blood test.  (Ricchuite Dep. 215:6-14).  Crick then took Ricchuite to the Todd County Detention Center in Elkton, Kentucky, where he was housed for 6-7 hours before being released.  (Crick Aff. ¶12).

On July 21, 2014, Ricchuite's DUI case went to trial before a Todd County Jury.  (Def. Mot. for Summ. J. Ex. 3, at 1, DN 71-8 [hereinafter Tr. of Criminal DUI Trial]).  The case had previously been screened for probable cause by Assistant Todd County Attorney, Mark Collins ("Collins").  (Def. Mot. for Summ. J. Ex. 6, at ¶ 3, DN 71-11 [hereinafter Mark Collins Aff.]). At trial, Ricchuite was acquitted of the misdemeanor DUI charge.

Eight days post-verdict, Ricchuite filed this civil action in the Todd Circuit Court against Defendants Todd County, Johnson, Berghammer, and Crick (collectively "Defendants"). (Notice of Removal, Ex. 1, DN 1-1 [hereinafter State Ct. Compl.]).  The individual Defendants were sued in both their individual and official capacities.  Pursuant to 28 U.S.C. § 1441, Defendants removed this action based on federal question jurisdiction.  (State Ct. Compl. 1).  On October 20, 2014, the Court dismissed all state law claims against Todd County and Johnson in his official capacity, but not against Johnson individually.  (Order Granting in Part Def.'s Mot. Dismiss, DN 11).  On March 31, 2016, all Defendants moved for summary judgment, which motions are now ripe.  (Def.'s Mot. Summ. J. DN 71 [hereinafter Johnson Mot.]; Def.'s Mot. for Summ. J. DN 72 [hereinafter Berghammer Mot.]; Def.'s Mot. for Summ. J. DN 73 [hereinafter Crick Mot.]).

## II.     JURISDICTION

This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   28 U.S.C. § 1331.   Additionally, this Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."   28 U.S.C. § 1367(a).

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   There is no genuine issue of material fact when "looking to the record as a whole, a reasonable mind could come to only one conclusion . . . ."   *Mickler v. Nimishillen & Tuscarawas Ry. Co*., 13 F.3d 184, 186 (6th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)).   "When moving for summary judgment the movant has the initial burden of showing the absence of a genuine dispute as to a material fact."   *Automated Sols. Corp. v. Paragon Data Sys., Inc*., 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).   "The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists 'a genuine issue for trial.'"   *Id*. (citing *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004)).

While the Court views the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (citations omitted).   Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or

7

by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."
Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-
moving party's] position will be insufficient; there must be evidence on which the jury could
reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Federal Law Claims

#### 1.   *Violation of Civil Rights*[2]

In Count Five of the Complaint, Ricchuite vaguely alleges "civil rights" claims based on
"[t]he actions and conduct of Defendants depriv[ing] Plaintiff of his right to due process and his
right to equal protection of the laws, among other rights, guaranteed by the Constitutions of the
United States and Kentucky."  (St. Ct. Compl. ¶ 40).  Presumably, Ricchuite is asserting a Fifth
or Fourteenth Amendment claim.

The Fifth Amendment to the United States Constitution guarantees that no citizen shall
be deprived of life, liberty, or property without due process of law.  U.S. Const. amend. V.
Defendants, who indisputably were state actors, cannot be liable for a claim under the Fifth

---

[2] Ricchuite has arguably abandoned this claim, as well as many of his claims discussed below,
for failing to respond and further articulate his argument in support of this claim in opposition to
Defendants' motions for summary judgment.  Ricchuite never mentions this claim in his
arguments, beyond the mere conclusory allegations in his complaint.  *See Resolution Tr. Corp. v.
Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate
arguments; grounds alleged in the complaint but not relied upon in summary judgment are
deemed abandoned." (citation omitted)); *see also Rumble v. Convergys*, No. C-1-07-979, 2010
WL 812775, at *13 (S.D. Ohio Mar. 9, 2010) ("Although Plaintiff's complaint contained claims
of age discrimination in violation of the ADEA and Ohio Rev. Code § 4112 [], her memorandum
in opposition is completely silent with respect to these claims.  Accordingly, because Plaintiff
has not presented evidence or argument to support her claims of age discrimination, Count II
should be dismissed as a matter of law." (citation omitted)).  Although raised in the Complaint,
Ricchuite also fails to raise any argument for many of his other claims in opposition to summary
judgment, including claims for state constitutional violations, invasion of privacy, civil
conspiracy, defamation, and outrage.  Regardless, in an abundance of caution, the Court will
consider these claims on their merits.

Amendment because that provision restricts only the powers of the federal government and does not apply to state action. *Wynn v. Morgan*, 861 F. Supp. 622 (E.D. Tenn. 1994). The Fourteenth Amendment to the United States Constitution extends the Fifth Amendment concept of due process to the states. *See* U.S. Const. amend. XIV, § 1. It is unclear precisely what constitutional claims Ricchuite asserts under the Fourteenth Amendment, so the court will address each possible theory of liability.

### a.        Procedural Due Process

The procedural component of the Due Process Clause requires a state to formulate procedural safeguards and adequate post-deprivation process sufficient to satisfy the dictates of fundamental fairness and the Due Process Clause. *Zinermon v. Burch*, 494 U.S. 113, 148 (1990). Generally, procedural due process violations fall into two categories:  (1) established state procedures which violate due process rights; and (2) random and unauthorized acts of state employees. *Mertik v. Blalock*, 983 F.2d 1353, 1365 (6th Cir. 1993).

Ricchuite has not demonstrated that he was deprived of notice or an opportunity to be heard. He was represented by counsel at all stages of his criminal trials and he has not identified any deficiency in the process that would support any claim that he was denied due process by established procedures, so in the instant case he is assumingly complaining of random and unauthorized acts of state employees.  "In such a case, the due process inquiry is limited to the adequacy of post-deprivation remedies provided by the state, and the burden is on the plaintiff to demonstrate the inadequacy of those remedies." *Mertik*, 983 F.2d at 1364 (citing *Zinermon*, 494 U.S. at 128-30).  The Supreme Court has likewise made it clear that a random and unauthorized deprivation of due process cannot be challenged under 42 U.S.C. § 1983 so long as the state provides an adequate post-deprivation remedy. *Parratt v. Taylor*, 451 U.S. 527, 541 (1981),

*overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Ingraham v. Wright*, 430 U.S. 651, 701 (1977).

Clearly a remedy was provided in the instant case, as Ricchuite was provided a day in court and acquitted of his charges.  Additionally, appropriate post-deprivation remedies may also take the form of the right to file a civil action asserting tort claims.  *See Parratt*, 451 U.S. at 544. Kentucky law provides tort remedies, as Ricchuite asserts them here in the Complaint.  Given the adequacy of the state remedies available to him, Ricchuite's attempt to invoke 42 U.S.C. § 1983 in the instant case must fail.

**b.     Substantive Due Process**

Substantive due process is "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed . . . ."  *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks omitted).  "It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'"  *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Bell v. Ohio State Univ*., 351 F.3d 240, 249-50 (6th Cir. 2003)).  In *Braley v. City of Pontiac*, 906 F.2d 220 (6th Cir. 1990), the Sixth Circuit advised discreet and judicious application of the "shock the conscience" standard in relation to police conduct, stating:

> Applying the "shock the conscience" test in an area other than excessive force . . . is problematic.  Not only are there fewer instances in the case law, but the "shock the conscience" test is not as uniformly applied to cases where excessive force or physical brutality is not the basis of the claim.  The "shock the conscience" standard, fuzzy under the best of circumstances, becomes fuzzy beyond a court's power to interpret objectively where there is a dearth of previous decisions on which to base the standard.  We doubt the utility of such a standard outside the

10

realm of physical abuse, an area in which the consciences of judges are shocked with some degree of uniformity.

*Id.* at 226.  Thus, the Sixth Circuit has been reluctant to find any police conduct to shock the conscience absent allegations of physical abuse.  *Id.*; *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1478 (6th Cir. 1993).

In this case, Ricchuite has not alleged that any actions of Defendants that would shock the conscience, as there is no claim of excessive force.  Thus, Ricchuite's substantive due process claim must fail because he has presented no evidence of any conduct by Defendants that could shock the conscience.

### c.      Equal Protection

The Fourteenth Amendment, with respect to equal protection, provides that "[n]o state shall . . . deny any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The equal protection clause requires public entities to treat similarly situated individuals in a similar manner.  *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1360 (6th Cir. 1996).  To state a claim under the equal protection clause, a plaintiff bears the burden of proving "a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990) (internal quotation marks omitted) (citation omitted); *see also Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) (citation omitted).

Ricchuite has provided no proof that he has been treated differently than others similarly situated.  He is a white male and is not a member of a suspect or protected class, and there is no evidence that Ricchuite was discriminated against on the basis of his race, religion, national origin, etc.  Therefore, Ricchuite's equal protection claim must fail.

### 2.   *Invasion of Privacy Claim*

Ricchuite asserts a claim against Defendants for "an invasion of [his] right to privacy, as guaranteed by the . . . United States Constitution."  (St. Ct. Compl. ¶ 23).  In his Complaint, he explains the factual basis to his right to privacy claim, asserting that Johnson "needlessly followed [him], observed [him], made video recordings of [him], told others harmful stories about [him] that were not true, and orchestrated and caused [him] to be charged with crimes for which he was not guilty . . . ."  (St. Ct. Compl. ¶ 12).

Even assuming that this factual basis could support a right to privacy claim under the federal constitution, Ricchuite's claim is time-barred.   Claims for federal constitutional violations are brought through 42 U.S.C. § 1983.  *See Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008).  As this Court explained in *Tucker v. Heaton*, No. 5:14-CV-00183-TBR-LLK, 2016 WL 7007527 (Nov. 29, 2016), "[s]ince § 1983 does not include a statute of limitations of its own, it borrows 'the statute of limitations governing personal injury actions from the state where the § 1983 action was brought.'  In Kentucky, actions of that sort must be 'commenced' within one year 'after the cause of action accrue[s].'  Ky. Rev. Stat. § 413.140(1)(a). Accordingly, § 1983 actions in Kentucky are subject to a one-year limitations period." *Id.* at *6 (internal citations omitted) (citation omitted).

All of the actions complained of by Ricchuite are outside of this one-year statute of limitations period.  The trial for the methamphetamine case was held on July 29, 2013.  (Docket Sheet 1).  Ricchuite's invasion of privacy claims all relate to the investigation of state charges; thus, the allegedly offensive actions must have occurred prior to Ricchuite's trial—i.e., on or

before July 28, 2013.[3]   Therefore, the actions accrued more than a year before this action was filed on July 29, 2014.  (St. Ct. Compl.).  Thus, the claim is time barred and summary judgment is appropriate.

### B.   State Law Claims

#### 1.   *Malicious Prosecution*

"In spite of the general disfavor, [Kentucky] case law recognizes that malicious prosecution claims are necessary to deter persons from procuring the arrest of another maliciously and without probable cause."[4]  *Hunt v. Lawson*, No. 2007-SC-000438-DG, 2008 WL 4691052, at *5 (Ky. Oct. 23, 2008) (internal quotation marks omitted) (quoting *Davis v. Brady*, 291 S.W. 412, 413 (Ky. 1927)).  Due to this general disfavor, the complaining party "must strictly comply with the prerequisites of maintaining an action for malicious prosecution." *Prewitt v. Sexton*, 777 S.W.2d 891, 895 (Ky. 1989) (internal quotation marks omitted) (citation omitted).  A recent Kentucky Supreme Court decision articulated the revised elements of a malicious prosecution claim and adopted the malicious prosecution elements from Sections 653 and 674 of the Restatement (Second) of Torts, as follows:

> 1)   the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2)   the defendant acted without probable cause;

---

[3] As noted above, Ricchuite conceded that Johnson's stalking activity occurred before the trial. (Ricchuite Dep. 126:1-10).

[4] In the Complaint, Ricchuite does not specify if his malicious prosecution claim is brought under Kentucky or federal law.  However, in opposition to Defendants' summary judgment motions, Ricchuite only cited to Kentucky law in support of his claim.  Thus, the Court presumes that the malicious prosecution claim is brought under Kentucky law.  Nevertheless, if Ricchuite's claim was construed under federal law, it would fail for the same reason, as absence of probable cause is an element of a federal malicious prosecution claim.  *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (holding that in order to prove a malicious prosecution claim under federal law, "the plaintiff must show that there was a lack of probable cause for the criminal prosecution." (citing *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007))).

3)      the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;

4)      the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and

5)      the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, No. 2014-SC-000373-DG, 2016 WL 5244518, at *8 (Ky. Sept. 22, 2016). Both sides concede that there were proceedings instituted against Ricchuite and the proceedings were terminated in his favor.   The elements at issue are whether Defendants   "initiated, continued, or procured" a criminal judicial proceeding against Ricchuite; lacked probable cause; and acted with malice.   The Court holds that Defendants acted with probable cause, thus Ricchuite cannot prove the second element of his malicious prosecution claim and his claim fails as a matter of law.

A plaintiff must make a clear showing that the defendant acted without probable cause. *Reid v. True*, 302 S.W.2d 846, 847-48 (Ky. 1957).  Probable cause is defined as "such ground as would induce a man of ordinary prudence to believe that the person prosecuted had committed the crime charged."  *Louisville & Nashville R.R. Co. v. Sharp*, 140 S.W.2d 383, 385 (Ky. 1940). "The burden in a malicious prosecution action is on the plaintiff to prove lack of probable cause, and probable cause issue is a question for the court to decide."  *Collins v. Williams*, 10 S.W.3d 493, 496 (Ky. App. 1999) (citing *Prewitt*, 777 S.W.2d at 894-95).

### a.      Probable Cause for the Complicity to Manufacture Methamphetamine Charge

Under Kentucky law, "[w]hen a grand jury, upon other testimony than that of the prosecutor alone, find an indictment to be a true bill, the presumption is prima facie that, as they, on their oaths, have said that the person indicted is guilty, the prosecutor had reasonable grounds

14

for the prosecution." *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 607 (Ky. App. 2006) (quoting *Conder v. Morrison*, 121 S.W.2d 930, 931 (Ky. 1939)).  "Courts have applied this same [principle] against police officer defendants." *Powell v. Cornett*, No. 3:11-cv-00628-H, 2013 WL 1703746, at *4 (W.D. Ky. Apr. 19, 2013) (citing *Davis v. McKinney*, 422 F. App'x 442, 443 (6th Cir. 2011)).  Consequently, while a grand jury indictment raises a presumption of probable cause, this presumption can be rebutted by the plaintiff. *Conder*, 121 S.W.2d at 931-32.  To overcome this presumption, a plaintiff must allege a "defect in the probable cause or warrant or indictment or subsequent prosecution" or "suggest[] an improper motive or [] improper acts" on the part of the defendants. *Wheeler v. Kirkland*, No. 07-CV-336-JMH, 2008 WL 440287, at *9 (E.D. Ky. Feb. 13, 2008) (discussing the claim of malicious prosecution under Kentucky law).

It is undisputed that there was an indictment by the grand jury.  (Indictment No. 12-CR-00014).[5]  Consequently, there is a presumption that Ricchuite's charges were based on probable cause. In an effort to rebut the presumption of probable cause, Ricchuite argues that the presumption is defeated by Defendants' deposition testimony, and also by Defendants alleged efforts to disparage Ricchuite.  (Pl.'s Resp. to Def.'s Mot. for Summ. J., 13, DN 81).

First, Ricchuite spends much time arguing that probable cause does not exist because Johnson and Berghammer admitted such.  (Pl.'s Resp. to Johnson. Mot. 16).  Despite Ricchuite's contentions, both Johnson and Berghammer testified they were privy to only limited information—not that probable cause did not exist. Berghammer testified as follows

Q:     **Were you aware of what you believed to be evidence sufficient to link [Ricchuite] to the tank?**

_____

[5] Ricchuite was indicted by the grand jury on two counts:  KRS 514.110 (Receiving Stolen Property, Anhydrous Ammonia with Intent to Manufacture Methamphetamine) and KRS 218A.1432 (Complicity to Manufacture of Methamphetamine).  (Indictment No. 12-CR-00014).

A:      **No, I don't know what other additional—I'd have to say no to that**.

Q:      Stuff that you knew, stuff that you were involved in, did you know of evidence sufficient to link [Ricchuite] to that anhydrous tank whereby he could be charged criminally?

A:      My part of it, no.  **I mean it was still an open investigation when I left out of it**.

Q:      Was any evidence later related to you by Sheriff Johnson or Tracy White connecting [Ricchuite] to that tank?

A:      No.

. . .

Q:      You testified you were not aware of evidence that would sufficiently link [Ricchuite] to the charges against him, correct?  I believe that's what you said earlier.

A:      Yes, ma'am.

Q:      Okay.  But you were not involved in every aspect of the investigation, were you?

A:      No, sir.

Q:      All right.  **And because you were not involved with the grand jury proceedings, you're not aware of all evidence that was presented to the grand jury, are you?**

A:      **No**, ma'am.

(Berghammer Dep. 70:1-14; 85:4-16 (emphasis added)).

Berghammer stated that he did not believe there was sufficient evidence to charge Ricchuite when the tank was unearthed on December 7, 2012, but the grand jury did not indict Ricchuite until April 19, 2013.  Thus, four months of investigation occurred after Berghammer's involvement in the investigation ended.  Because Berghammer did not participate in the grand jury proceedings, he could not have known all of the evidence that was presented.

Likewise, Ricchuite claims that Johnson admitted that there was no probable cause for the state charges.  He does this without citation to the record and does not explain when and where these statements were made.  What Ricchuite may have been referring to was the following testimony by Johnson:

Q:      Were you ever able to identify any of the people involved in the manufacturing process from which you found evidence?

A:      **As far as on the scene, no**; just from the company Mr. Watson Ricchuite had, we figured they were involved.

16

(Johnson Dep. 59:1-6 (emphasis added)).

Johnson did not admit there was insufficient evidence for probable cause. Instead, he testified he was not able to identify the people manufacturing methamphetamine on the scene, but like Berghammer, Johnson's work on the investigation ended months before the grand jury returned an indictment. Additionally, it was not the identity of people on the scene, but the fact that a 1,000 gallon anhydrous ammonia tank was found buried on the Ricchuite's property that supported probable cause. Thus, neither Johnson nor Berghammer's testimony negates a finding of probable cause by the grand jury as Ricchuite suggests.

Ricchuite next argues that the alleged disparaging remarks made by Berghammer and Johnson rebut probable cause because they influenced the community to think that Ricchuite had committed the crime. (Pl.'s Resp. to Johnson Mot. 16). However, as discussed below, all of these supposed statements are inadmissible hearsay as Ricchuite has no first-hand knowledge of these statements, and he has not provided any witness who does. *See infra* Section B.5. Moreover, Ricchuite has produced no evidence as to how the grand jury was tainted by the supposed disparaging statements when it returned the indictment.

What is most detrimental to Ricchuite's arguments is that he was indicted by a grand jury before which Johnson and Berghammer *did not even testify*. (Berghammer Dep. 70:15-17; Johnson Dep. 82:2-10). Therefore, it is unclear how Johnson or Berghammer could have improperly influenced the grand jury in its determination of probable cause. Therefore, because Ricchuite has not offered evidence to rebut the grand jury's finding of probable cause, his malicious prosecution claim asserted against Johnson and Berghammer fails as a matter of law.

17

### b.      Probable Cause for the DUI Charge

Construing the facts in favor of Ricchuite, no genuine dispute remains that probable cause existed regarding the charge against Ricchuite for operating a motor vehicle under the influence.  "A person shall not operate or be in physical control of a motor vehicle anywhere in this state . . . [w]hile under the combined influence of alcohol and any other substance which impairs one's driving ability . . . ."  KRS 189A.010(1)(e).  Although Ricchuite disputes some of the facts, even under Ricchuite's view of the facts, a reasonable officer would have perceived probable cause for this charge.

Crick based his conclusion that Ricchuite was driving under the influence of an intoxicant other than alcohol based upon:  (1) Ricchuite's highly nervous and agitated state and jittery demeanor; (2) he was smacking his gum, grinding his teeth, and rubbing his fingers together frantically; (3) Ricchuite complained of a dry mouth and excessive thirst; (4) he was sweating profusely; (7) he gave incoherent answers to questions; and (8) he failed three sobriety tests.  (Crick Aff. ¶ 9; KYIBRS Report III, at 3).  Ricchuite admits that he "could have been" acting in this manner, however, he blames his demeanor on dental problems, a vitamin deficiency and nerve problems.  (Ricchuite Dep. 209:2-211:16).  Regardless, even if Ricchuite's behavior was related to health issues, an officer observing this behavior could certainly believe that such a person was under the influence of a stimulant.  *See Hunt*, 2008 WL 4691052, at *5 (holding that officer's observations of a strong odor of alcohol, signs of impairment, and failure of a verbal field sobriety test were enough to establish probable cause for a driving under the influence of alcohol charge under Kentucky law); *see also United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981), *overruled on other grounds by Steagald v. United States*, 451 U.S. 204

(1981) (stating that probable cause does not require "proof beyond a reasonable doubt," but simply evidence to establish that it is "more likely than not" that a crime has been committed).

Furthermore, it is notable that probable cause was also found by the prosecuting attorney (Collins) and the trial judge.  According to Collins, once an arrest is made, he performs a screening function to determine if probable cause existed in the case.  (Collins Aff. ¶ 2).  Collins examined the facts and evidence in the case and found that probable cause existed for the DUI arrest of Ricchuite.  (Collins Aff. ¶ 3).  Additionally, the trial judge denied Ricchuite's directed verdict for acquittal during the DUI trial on two occasions.  (Berghammer Mot., Ex.71 at 3, DN71-12 [Tr. of Bench Conferences at Crim. Trial]; Ex. 8, DN 71-13 [hereinafter Criminal DUI Trial Video, 14-T-00369 10:55 a.m.]).

Considering the undisputed facts, this Court finds that the facts "would induce a man of ordinary prudence to believe that the person prosecuted had committed the crime charged." *Louisville & N.R. Co*., 140 S.W.2d at 385.  Thus, the Court finds that probable cause was present as a matter of law, and Crick's motion for summary judgment on the malicious prosecution claim will be granted.

### 2.   *Civil Conspiracy*

Under Kentucky law, to establish a civil conspiracy claim a plaintiff must allege "a corrupt or unlawful combination or agreement between two or more persons who do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co*., 277 S.W.3d 255, 261 (Ky. App. 2008) (internal quotation marks omitted) (quoting *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 231, 325 (Ky. 1936)).[6]   A

---

[6] Much like Ricchuite's malicious prosecution claim, the Complaint does not indicate whether the conspiracy claim is brought under state of federal law.  Ricchuite's responses to Defendant's motions for summary judgment cite only Kentucky law, so the Court will presume that his civil

conspiracy is inherently difficult to prove.  Notwithstanding that difficulty, the burden is on the party alleging that the conspiracy to establish each and every element of the claim in order to prevail.  *James v. Wilson*, 95 S.W.3d 875, 896 (Ky. App. 2002) (citing *Krauss Wills Co. v. Publishers Printing Co.*, 390 S.W.2d 132, 134 (Ky. 1965)).  The tort of civil conspiracy is not a freestanding claim, "[t]hus, if a plaintiff's claim for the underlying tort fails, so does the claim for conspiracy."  *Madden v. Piper*, No. 1:16-CV-P21-GNS, 2016 WL 7116189, at *5 (W.D. Ky. Dec. 6, 2016) (citing *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, No. 2008-CA-002389-MR, 2010 WL 2696278, at *13 (Ky. App. July 9, 2010)); *see also James*, 95 S.W.3d at 897 ("The Court acknowledged that there is no such thing as a civil action for conspiracy, noting that the action is for damages caused by acts committed pursuant to a formed conspiracy.  In the absence of such acts done by one or more of the conspirators and resulting in damage, no civil action lies against anyone since the gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy."  (citing *Krauss Wills Co.*, 390 S.W.2d at 134)).

The allegations that Crick and Berghammer "assisted, aided, abetted, acted in concert with, and in a conspiracy with" Johnson to violate Ricchuite's civil rights are purely conclusory. (St. Ct. Compl. ¶¶ 15, 16).  Ricchuite offers no evidence to demonstrate that Defendants were in "an unlawful combination or agreement" with each other.  In fact, Ricchuite's own testimony belies his claim as to a conspiracy between Johnson and Crick.  Ricchuite testified:

---

conspiracy claim is brought under Kentucky law.  Regardless, even if it was brought under federal law the Court would note that his claim would fail on the merits because Ricchuite does not allege that the conspiracy was motivated by racial or other "class-based invidiously discriminatory amicus" or other discriminatory motive, as required for a conspiracy claim under federal law.  *See Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994) (citation omitted); *Moniz v. Cox*, 512 F. App'x 495, 499-500 (6th Cir. 2013) (citation omitted).

> Q      Are you aware of any evidence or been told by anyone that Sheriff
> Johnson was encouraging or ordering Trooper Crick to follow you?
> A      No, sir.
> Q      Okay. Did Trooper Crick ever mention Sheriff Johnson to you?
> A      No, sir.
> Q      How about the other way around? Did Sheriff Johnson ever mention
> Trooper Crick to you?
> A      I never talked to Sheriff Johnson.

(Ricchuite Dep. 123:1-123:16).  Ricchuite testified that he was not aware of any evidence of an

agreement between Crick and Johnson.  Furthermore, aside from Ricchuite's own conclusory

allegations, there is no evidence in the record to indicate that Berghammer and Johnson were

involved in any type of unlawful agreement.

Moreover, the Court finds that all of Ricchuite's underlying tort claims fail on their

merits; therefore, there is no underlying tort claim to support a tort claim of civil conspiracy.  *See*

*Stonestreet Farm, LLC*, 2010 WL 2696278, at *13 (holding that a civil conspiracy claim under

Kentucky law is not a freestanding claim).  Thus, Ricchuite's conspiracy claim brought under

Kentucky law fails as a matter of law and summary judgment is appropriate.

### 3.      *Kentucky Constitutional Claims*

In Count Two of his Complaint, Ricchuite brings an invasion-of-privacy claim under the

Kentucky Constitution.  In Count Five, Ricchuite vaguely alleges "civil rights" claims based on

"[t]he actions and conduct of Defendants depriv[ing] Plaintiff of his right to due process and his

right to equal protection of the laws, among other rights, guaranteed by the Constitutions of the

United States and Kentucky."  (St. Ct. Compl. ¶ 40).  Because Kentucky law does not provide

for a cause of action for state constitutional violations, this claim fails as a matter of law.  *See*

*Tucker*,  2016 WL 7007527, at *5 ("[U]nder Kentucky law, there is no 'private right of action for

state constitutional violations.'"  (quoting *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 536-37

(Ky. 2011))).

### 4.   *Harassment*

Johnson argues that the claim for harassment should fail on the merits because his actions served a legitimate purpose and he did not act with the requisite "intent to intimidate, harass, annoy or alarm" as is required under KRS 525.070.[7, 8]   Applicable portions of KRS 525.070 provide:

> (1)   A person is guilty of harassment when, *with intent* to intimidate, harass, annoy or alarm another person, he or she:
> . . .
> (d)   Follows a person in or about a public place or places;
>
> (e)   Engages in a course of conduct or repeatedly commits act which alarm and seriously annoy such other person and which serve *no legitimate purpose* . . . .

KRS 525.070(1)(d)-(e) (emphasis added).   The legislative commentary to the statute notes that "[s]ubsection (1)(d) requires a series of acts which serve *no legitimate purpose* and which alarm or seriously annoy another person."   KRS 525.070 (emphasis added).   Thus, both subsection (d) and (e) of the statute require that the allegedly harassing actions serve no legitimate purpose.

In the Complaint, Ricchuite alleges the following acts of harassment:   Johnson followed plaintiff in his patrol car nightly; Johnson surveilled Ricchuite's home; and Johnson used a video

---

[7] Johnson also argues that the claim is time barred under the applicable one-year statute of limitations and cites *Brooks v. Kentucky Community Technical College*, No. 11-CV-425-JMH, 2012 WL 2944456, at *2-3 (E.D. Ky. July 19, 2012).   The more salient guidance comes from the Kentucky Supreme Court's decision in *Craft v. Rice*, 671 S.W.2d 247 (Ky. 1984).   In *Rice*, the Kentucky Supreme Court reversed the decision of the Court of Appeals that applied a one year statute of limitations for personal injury when dealing with an intentional infliction of emotional distress claim.   *Id.* at 249.   The Kentucky Supreme Court reasoned that the five-year statute of limitations applies when the gist of the tort is the claimed interference with the plaintiff's rights causing emotional distress and generating a cause of action regardless of whether the plaintiff suffers any bodily harm.   *Id.*   Thus, the court ruled that five-year statute of limitations was proper because it related to the interference with a right not otherwise enumerated in the limitations statute.   *Id.*   Here, because Ricchuite has not alleged any personal injury arising from the harassment, the five-year statute of limitations period applies and the claim is not time-barred.

[8] KRS 525.070 is a Kentucky criminal statute.   KRS 446.070 provides a civil cause of action for violations of Kentucky statutes.

camera on at least one occasion to record Ricchuite.  (State Ct. Compl. 3).  The frequency of Johnson following Ricchuite in his patrol car is disputed; even so, viewing the facts in the light most favorable to Ricchuite and assuming that Johnson did follow Ricchuite in his car nightly, Johnson's actions do not constitute harassment because they served a legitimate law enforcement purpose.  *See Talley v. MAC Auto Team, LLC*, No. 2015-CA-000453-MR, 2016 WL 4410091, at *3 (Ky. App. Aug. 19, 2016) (finding that the defendant's distribution of a sex offender registry that included the plaintiff's information did not amount to harassment because the legislature intended the publication of the registry to serve a public safety function).

As Sheriff, Johnson was authorized to investigate suspected criminal activity. Considering a 1,000 gallon tank of anhydrous ammonia was found buried on Ricchuite's farm, Johnson had objective reason to believe that Ricchuite was involved in criminal activity.  In support of the reasonableness of Johnson's suspicion, he relies upon his law enforcement expert, Michael D. Bosse ("Bosse"), who concluded that "[b]ased on the totality of the circumstances, the investigators believed . . . Ricchuite actively managed that property. . . and that he was involved in and or, knew of, and allowed, the activity [manufacture of methamphetamine] to take place on the property."  (Def.'s Mot. Summ. J. Ex. 1, at 2, DN 67-2 [hereinafter Bosse Report]).

Other than speculation, Ricchuite adduced no evidence that Johnson possessed the intent necessary to establish a claim of harassment.  Ricchuite claims that Johnson bore ill will towards him because Johnson told him during a search of the property that he "did not want to hear from [Ricchuite's] smart mouth" and because Johnson continued to surveille the property after the case was turned over to White.[9]  (Pl.'s Resp. Def.'s Mot. Summ. J. 20, DN 83 [hereinafter Pl.'s Resp. to Johnson Mot.]).  This insubstantial evidence of personal dislike is insufficient to prove

---

[9] Ricchuite also discusses the alleged disparaging remarks made by Johnson evidence to support this animosity, but for reasons discussed below these alleged statements are inadmissible.

that Johnson acted with "intent to intimidate, harass, annoy or alarm." *See Talley*, 2016 WL 4410091, at *3 ("[O]ther than the presence of speculation, the record is devoid of concrete evidence that [the defendants] . . . acted with the intent necessary to underlie a viable claim of harassment."). Additionally, because at all times Johnson was performing a legitimate law enforcement function, there is no genuine issue of material fact concerning Ricchuite's harassment claim and summary judgment is appropriate for that claim.

### 5.   *Defamation*

Ricchuite's defamation claim against Johnson consists in its entirety of inadmissible hearsay, which is to say Ricchuite has no evidence to support his defamation claim. Under Kentucky law, the essential elements of defamation include: "(1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation." *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981). While it is not necessary in connection with a motion for summary judgment that the proponent offer evidence in admissible form, the opponent must demonstrate that admissible evidence not consisting of hearsay can be produced at trial. *Beckett v. Ford*, 384 F. App'x 435, 442-43 (6th Cir. 2010). At the summary judgment stage, "[h]earsay evidence . . . must be disregarded." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (citing *U.S. Structures, Inc. v. J.P. Structures*, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997)). Additionally, Federal Rule of Civil Procedure 56(e) requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

Ricchuite's proffered evidence in support of this claim is summarized as follows:

- Christian told Ricchuite that Johnson said he was guilty and had bought off the Todd County Attorney and a judge. (Ricchuite Dep. 75:12-21).

- Ricchuite said that Potter and Chastine overheard Johnson say that plaintiff was the biggest drug dealer in the county, a kingpin of organized crime, and had one million dollars buried in his backyard.  (Ricchuite Dep. 78:7-79:3; Ricchuite Aff. 2).

- Ricchuite was told by Potter and Scott Shelton that Johnson told Laster that Ricchuite was the biggest drug dealer in western Kentucky and he sold drugs to school children.  (Ricchuite Dep. 85:15-86:8; Ricchuite Aff. 2).

- White alleged told Ricchuite that Johnson said Ricchuite had bought off a juror.  (Ricchuite Dep. 81:17-82:2; Ricchuite Aff. 2).

- Ricchuite testified the mayor of Elkton told him that that Johnson told Atkinson that even if he did not have enough evidence against plaintiff, he would make plaintiff pay for a lawyer.  (Ricchuite Dep. 92:5-17; Ricchuite Aff. 1).

None of the evidence of Johnson's alleged defamatory statements is based upon Ricchuite's personal knowledge.  Instead, all of the statements come from Ricchuite third-hand.  There have been no affidavits or testimony produced from any person who actually heard Johnson make these supposed statements.   Because all of Ricchuite's evidence on this claim consists of inadmissible hearsay, Ricchuite has failed to produce evidence linking Johnson to any defamatory remarks.  Thus, because Ricchuite has offered no support for his defamation claim it fails as a matter of law, and summary judgment is appropriate.

### 6.   *Outrageous Conduct*

Ricchuite brings a claim for outrageous conduct against Johnson.  (St. Ct. Compl. ¶¶ 51-53).  Kentucky law recognizes the tort of outrage, also known as intentional infliction of emotional distress ("IIED").  *See Craft*, 671 S.W.2d at 249.  To establish a claim for IIED, the plaintiff must establish:  (1) "[t]he wrongdoer's conduct must be intentional or reckless"; (2) "the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality"; (3) "there must be a causal connection between the wrongdoer's conduct and the emotional distress"; and (4) "the distress suffered must be severe."

*Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000) (citing *Craft*, 671 S.W.2d at 249).  The Kentucky Supreme Court held that "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004), *overruled on other grounds by Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 286-87 (Ky. 2014).  Conduct will only be seen as outrageous, and thus actionable, if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. at 789 (Ky. 2004) (quoting Restatement (Second) of Torts § 46(a) cmt. d).  "Mere insults, indignities, threats, annoyances, petty oppressions, [and] other trivialities" do not meet this standard. *Id*.

The Court holds that Ricchuite has not identified any conduct that would be deemed to be "extreme" and "outrageous."  Although Ricchuite does not allege what actions of Johnson in particular were outrageous, the Court finds nothing asserted in this case rises to that level, even when viewing the facts in the light most favorable to him.  Johnson following Ricchuite in his patrol car and surveilling his home during the investigation of the anhydrous tank would not rise to the level of outrageous conduct.  *See* Restatement (Second) of Torts § 46 (listing examples of actionable conduct); *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-4 (Ky. 1990) (affirming summary judgment for the defendant on the outrage claim where nurses told the grieving mother of a stillborn baby to "shut up" and that the hospital would take care of disposing of the dead baby).  Furthermore, Ricchuite has not shown that these actions were taken with the sole intent to cause extreme emotional distress to him.  *See Michals v. William T. Watkins Mem'l United Methodist Church*, 873 S.W.2d 216, 220 (Ky. App. 1994) (holding the plaintiffs failed to prove an intentional infliction of emotional distress claim where there was no evidence the defendant

26

intended to cause extreme emotional distress).  Thus, summary judgment is appropriate on this claim.

**b.      Vicarious Liability of Todd County**

As a final matter, Ricchuite asserts that Todd County is vicariously liable for any and all torts and constitutional violations committed by Defendants.  For the reasons explained above, the Court holds that all of Ricchuite's claims fail as a matter of law.  Accordingly, there is no basis to hold Todd County vicariously liable.  Thus, summary judgment for Todd County is appropriate on Ricchuite's claim of vicarious liability.

**c.      Qualified Immunity**

All Defendants have asserted the defense of qualified immunity.  Because none of Ricchuite's claims survive on the merits, however, the Court will not analyze whether the Defendants are entitled to qualified immunity.

**V.      CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment (DN 67, 71, 72) are **GRANTED**, and Defendants' Motions to Supplement (DN 87, 88, 89) are **DENIED AS MOOT**.

**Greg N. Stivers, Judge**
**United States District Court**
March 8, 2017

cc:      counsel of record

27